IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2005

**STATE OF TENNESSEE v. COREY MOTEN**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-07148     Chris Craft, Judge**

_____

**No. W2004-02896-CCA-R3-CD  - Filed January 26, 2006**

_____

The defendant, Corey Moten, was convicted of second degree murder, a Class A felony, and sentenced as a violent offender to twenty years in the Department of Correction.  On appeal, he argues that the evidence is insufficient to support his conviction and that the trial court erred in giving a sequential jury instruction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Marvin Ballin (at trial) and Blake D. Ballin (on appeal), Memphis, Tennessee, for the appellant, Corey Moten.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stephen P. Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At the defendant's August 2-4, 2004, trial, Maria Gauntlett, the victim's sister, testified that the victim was thirty-one years old at the time of her death and had been married to the defendant between five and seven years.

Officer Tim Monistere testified that he responded to a "wounded party" call sometime after midnight on February 2, 2001, at the residence of the defendant and the victim in Shelby County. Emergency medical personnel advised Monistere that the victim, Orchid Moten, was dead.  The defendant, who appeared "pretty calm and quiet acting," told Monistere that he had arrived home from work around 12:44 a.m., found the victim with a wound to her neck in the laundry room, and

called the police. Officer Monistere described the victim's appearance: "[S]he was laying [sic] on her back on the floor. There was blood around her head. And there was a towel like over her head and neck area. Her pants were completely off except for one portion of the pants and her shirt was like torn off of her. It was kind of partially hanging on her."

Sergeant Mark Rewalt testified that he made photographs and collected evidence at the crime scene. He identified a diagram he had made of the scene, as well as photographs of various items, including a "turned-over"curio cabinet, a bloody nylon rope, a short telephone cord with connectors on both ends, a set of keys, the kitchen window mini blinds found lying in the sink, and a green Army jacket. Sergeant Rewalt found two cords coming out of the telephone: one that was cut or torn that ran down to the dining room and another one that ran "along to the living room and it's connected to another extension and going into a wall." He said that "utensils used to smoke crack along with a cigarette lighter" were found in the dryer and that bloodstains were found only in the laundry room.

Lieutenant Vennes Owens testified that when he arrived at the crime scene between 2:00 and 3:00 a.m., the defendant told him he "had come home from work and found his wife in the back of the house dead." Lieutenant Owens observed "a lot of disarray" inside the house. The defendant subsequently was taken to the police station where he signed a waiver of rights and a consent form to search his residence. The case was assigned to Sergeant Ashton, and Lieutenant Owens and Sergeant Shemwell returned to the crime scene where they "identified all the knives in the house and left them there" and collected a sponge.

Captain James L. Fitzpatrick testified that Sergeant William Ashton was the case coordinator but was unavailable to testify because he was currently on active duty in the United States Coast Guard Reserves. Captain Fitzpatrick said he participated in the interview of the defendant which began around 11:45 a.m. on February 2, 2001. Fitzpatrick knew that the defendant already had been advised of his rights and said that the defendant signed a waiver of rights. The defendant initially told the officers that, when he arrived home at about 12:30 a.m., the door was unlocked. He said he found his wife in the laundry room, locked his dog in a room, and called 9-1-1. The defendant also said that one of the telephones had been "jerked" from the wall. During the interview, Sergeant Ashton received a call from Sergeant Shemwell who advised that "a little rectangular pot scrubber that had been used" to clean up blood had been found at the crime scene. Captain Fitzpatrick then confronted the defendant about the inconsistences in what he had told the officers and the evidence that had been collected. When the officers questioned the defendant about the sponge, he admitted that he had used the sponge "to clean up the blood and then had rinsed it out and had placed it in a dish which is exactly where it had been found."

Asked if the defendant later "change[d] his story," Captain Fitzpatrick replied:

> And we confronted him with them one after another breaking down the initial story that he had told. He had been calm up until a certain point and then it's almost as you see on Perry Mason. Once this information began to build up and build up

and build up and then he broke down and admitted that he had been the person who had inflicted the injuries on Mrs. Moten.

The defendant's statement was reduced to writing, and the defendant signed it. In his statement, the defendant said he had "cut [the victim] with a kitchen knife," which he described as a "steak knife size" with "a brown wooden handle." Asked what had caused the altercation between him and the victim, the defendant replied:

> Well, when I got home, my neighbor next door, Buddy, told me that some people had been going in and out of the house earlier that day. When I went in, I let the dog in the house and put the dog in the room that she sleeps in. I asked her why had people been going in and out of this house and you know I don't like people in this house when I'm not here. She told me that there hadn't been nobody in this house and I told her that she was lying because Buddy had told me that he had seen people going in and out of the house. She told me that he was lying and I told her, "[Y]ea, right. I don't believe you" and I went to the bathroom to use it and she confronted me at the bathroom door when I tried to walk past and she grabbed me and I pushed her off of me and she fell into the shelf that was sitting by the bathroom door.
>
> After I pushed her I went to the kitchen. I went to get something to drink. She kept pulling on my arm and she hit me in the back of my head so I turned around and hit her in the shoulder. She swung at me and she missed and then I grabbed her and grabbed the cord on the kitchen counter and wrapped it around her neck. Then I pulled open the kitchen drawer and grabbed the kitchen knife. She started pulling away from me after I wrapped the cord around her neck. She reached for the back door and opened it and I snatched her back and I cut her. Then she fell down and started bleeding and I walked away and came back and tried to clean up the blood and I cleaned the knife and put it back and I put the sponge back into the dish and I called 9-1-1.

The defendant admitted that he had pulled the victim's pants off "[t]o make it look like somebody else did it." He acknowledged that he had "knocked" the blinds off the wall in the kitchen when he put the sponge back. The defendant said that he had not wanted to kill the victim because he loved her and that he "just snapped." Captain Fitzpatrick said the defendant never indicated that he had killed the victim in self-defense or that he had been injured during the altercation. Fitzpatrick acknowledged that the defendant had been awake for at least eighteen hours at the time he gave his statement.

Lieutenant Robert Shemwell testified that he and Sergeant Vennes Owens were instructed to search for bloody clothing at the crime scene. Although they did not find any bloody clothing, they found a wet sponge with the "same width of the pattern of blood smear pattern that was beside the [victim's] body on the floor." Shemwell placed the sponge beside the blood smear on the floor

-3-

and took a photograph for comparison purposes. He then took the sponge to the homicide office where he showed it to Sergeant Ashton. After he learned that the defendant had confessed to killing the victim, Lieutenant Shemwell returned to the crime scene to "locate a knife that was possibly used in the murder." The officers had received information that the murder weapon was "a serrated edge knife, like a steak knife with a wooden handle." Photographs were made of several knives found in a drawer and one was collected as evidence. Sergeant Ashton later showed the collected knife to the defendant who verified that it was the knife he had used to kill the victim.

Dr. Jennifer Love, a forensic anthropologist at the Regional Forensic Center of Memphis who was accepted by the court as an expert in the field of forensic anthropology, testified that she had reviewed the victim's autopsy report and had examined a forensic cast made of the cartilage from the victim's neck region. She made sample cut marks with the suspect knife, compared them to the castings made of the cartilage of the victim's neck, and opined that the knife was "consistent with the knife that was used in terms of the serrations." However, she could not determine if the knife was the actual murder weapon.

Dr. O'Brian Cleary Smith testified that he performed the autopsy on the victim's body on February 2, 2001, which revealed the presence of alcohol and cocaine in her system. He said the victim died "as a result of both ligature strangulation and cutting of the neck. Specifically with the ligature strangulation there's a mark left on the skin at the front surface of the neck that is consistent with a narrow cord that measures about one tenth of an inch." He described the cuts to the victim's neck:

In the front portion of the neck there was a series of wounds about five and three quarter inches in length across the front. And it was not a single wound but it was a confluence of at least three wounds in which there were – you could tell where a wound would start and then another wound would begin within that wound and it would leave a jagged edge or margin to the wound indicating that about three or a minium of three passes of the knife were required to produce a wound of this type. There were two small superficial abrasions where the cutting surface of the knife barely touched the skin. It was just enough to cut through the very top layers. Those were in line with two of the other two cuts. So I think with a fair degree of medical competence and certainty at a minium of three passes of the knife would have been required to produce the injuries to the neck. Those injuries went down deep enough to cut through the two heavy muscles on either side of the neck . . . . In so doing the knife went through both of the jugular veins, the external jugular veins. . . . [T]he knife proceeded through the windpipe and the voice box cutting it almost to the rear wall of the windpipe leaving tool marks present in the cartilage of those tissues.

Asked which injury caused the victim's death, Dr. Smith opined that either the knife wounds or the strangulation could have been lethal and said that each injury occurred while the victim was still alive. He agreed that a cut to the victim could have begun while she was standing but said she "did not have the extensive damage to her neck done while she was standing up."

-4-

The defendant did not present any proof at trial.

## ANALYSIS

## I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support his conviction for second degree murder, saying the proof at trial established that he "was in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2003). "Knowing" is defined as:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature

of the conduct or that the circumstances exist.  A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Id.  § 39-11-106(a)(20).  Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Id. § 39-13-211(a).  "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury." State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).  To support a second degree murder conviction, the State had only to establish that the killing of the victim was knowing beyond a reasonable doubt. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995).

The defendant argues that his statement to police officers established that he acted as a result of adequate provocation.  He asserts on appeal that he had received information that the victim was having an affair while he was at work and that when he confronted the victim with this information, the victim assaulted him.  According to the defendant, as a result of the victim's assault upon him and his belief that she was having an affair, he "went into a rage."  In his statement, the defendant said his neighbor had told him "that some people had been going in and out of the house earlier that day"; he and the victim argued about the neighbor's comment; the argument became physical; he wrapped a cord around the victim's neck; the victim reached for the back door and opened it; and he "snatched" the victim back and cut her with a kitchen knife.  These actions were sufficient to support the jury's finding that the defendant committed a knowing killing of the victim.

## II.  Sequential Jury Instruction

The defendant argues that his rights to due process and to a trial by jury were violated by the trial court's instructing sequentially as to second degree murder and voluntary manslaughter, with the jury not to consider the lesser offense unless it first determined that the defendant was not guilty of second degree murder.  According to the defendant's argument,  "the instructions given by the trial court are of the type that fail to fairly submit the legal issues and mislead the jury thus violating the defendant's right to due process and to a trial by jury under the Tennessee and United States Constitutions."

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).  Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)).  As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).  Furthermore, there is no requirement that a trial court be limited to using pattern jury instructions. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992).  When reviewing challenged jury instructions, we

must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

In the present appeal, the trial court instructed the jury on the indicted offense of second degree murder and the lesser-included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court also instructed the jury not to consider the lesser-included offenses unless it first acquitted the defendant of the greater offense.

It is settled law that a jury is instructed to consider, in sequential fashion, first the indicted offense and then the lesser-included offenses:

> The appellant next contends that the trial court erred in giving sequential instructions on first degree murder, second degree murder, and voluntary manslaughter. We disagree. This court has repeatedly upheld "acquittal-first" instructions. See State v. Raines, 882 S.W.2d 376, 381-82 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994); State v. McPherson, 882 S.W.2d 365, 375 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994); State v. Rutherford, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994); State v. Beckham, No. 02C01-9406-CR-00107, 1996 WL 389321 (Tenn. Crim. App., at Jackson, Sept. 27, 1995). Accordingly, this issue is without merit.

State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997).

Applying the holding of Mann, we conclude, likewise, that this issue is without merit.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE